**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| MARCOS L.,<br>　　　　Plaintiff, | No. 3:19-cv-1921 (SRU) |
| v. | |
| ANDREW SAUL, ACTING<br>COMMISSIONER OF SOCIAL<br>SECURITY,<br>　　　　Defendant. | |

## RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS

In this Social Security appeal, Marcos L. ("Marcos") moves to vacate the decision by the

Social Security Administration ("SSA") denying his claim for disability insurance benefits. *See*

Mot. to Reverse, Doc. No. 15-1. The Commissioner of the Social Security Administration (the

"Commissioner") moves to affirm. *See* Mot. to Affirm, Doc. No. 17. For the reasons that

follow, I **deny** Marcos's motion and **grant** the Commissioner's.

## I.　　Standard of Review

The SSA follows a five-step process to evaluate disability claims. *Selian v. Astrue*, 708

F.3d 409, 417 (2d Cir. 2013) (per curiam). First, the Commissioner determines whether the

claimant currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373

n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)). Second, if the claimant is not

working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e.,

an impairment that limits his or her ability to do work-related activities (physical or mental). *Id.*

(citing 20 C.F.R. §§ 404.1520(c), 404.1521). Third, if the claimant does have a severe

impairment, the Commissioner determines whether the impairment is considered "per se

disabling" under SSA regulations, that is, whether the impairment meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526); *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). If the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record." *Greek*, 802 F.3d at 373. (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)). "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment." *Id.* Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)). Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national economy." *Id.* (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)). The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria. *See id.*

The claimant bears the ultimate burden of proving that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the inquiry. *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418. If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). At step five, the Commissioner need only show that "there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's residual functional capacity." *Id.*

2

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374–75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447–48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greek*, 802 F.3d at 375 (citation omitted). Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## II.     Facts[1]

Marcos applied for Title XVI Supplemental Security Income ("SSI") and Title II Disability Insurance Benefits ("DIB") benefits on July 13, 2015, alleging that he was disabled as of January 1, 2014 due to depression and HIV. *See* R. at 4, 137. As set forth more fully below, Marcos's application was denied at each level of review. He now seeks an order vacating the decision and remanding for a new hearing.

---

[1] The following facts are drawn primarily from Marcos's Statement of Facts and from the Commissioner's Statement of Facts. *See* Doc. Nos. 15-2, 17-2.

A. <u>Medical History</u>

Marcos was diagnosed with HIV in 2013.  *See* Doc. No. 15-2, at ¶ 44 (citing R. at 684).

He is asymptomatic and has a stable immune system, and does not meet the diagnostic criteria

for AIDS.  *See id.* at ¶¶ 9, 44; R. at 446.

From 2013 through 2015, Marcos sustained injuries in a series of car accidents.  On

August 18, 2013, he was struck by a vehicle and then rear-ended, and the airbags did not deploy.

*See* Doc. No. 15-2, at ¶ 2.  He presented to the emergency department with neck pain radiating

into his left arm and was discharged that same day.  *See id.* at ¶ 2 (citing R. at 389).

Approximately five months later, on February 28, 2014, Marcos was in another car

accident and was transported to the emergency department via ambulance.  *See* Doc. No. 15-2, at

¶ 4 (citing R. at 407, 408, 412).  He reported neck pain and lower back pain of moderate severity.

*See* Doc. No. 15-2, at ¶ 4 (citing R. at 408).  A CT scan performed of Marcos's brain and

cervical spine that day reflected no acute findings other than minimal biapical bullous disease.

*See* Doc. No. 15-2, at ¶ 5; R. at 404–05.  A lateral view of the cervical spine also revealed

normal findings, as did a lumbar radiograph.  *See* Doc. No. 15-2, at ¶ 5 (citing R. at 404, 405).

Thereafter, on June 7, 2014, Marcos presented to the emergency room with sharp pain in

the right side of his abdomen.  *See id.* at ¶ 6 (citing R. at 426).  He had a negative abdominal CT

scan, the findings of which did not suggest acute appendicitis.  *See id.* at ¶ 6 (citing R. at 425).

He again presented to the emergency department on August 8, 2014 with abdominal pain, which

was localized in the left, upper, and lower abdomen.  *See id.* at ¶ 7 (citing R. at 415, 416).  He

had also suffered from rectal bleeding for three days, which eventually stopped.  *See id.* at ¶ 7; R.

at 416.

On April 26, 2015, Marcos was brought by ambulance to the emergency department and

reported that he was assaulted two hours ago.  *See id.* at ¶ 8.  He stated that his entire body hurt

and that his level of pain was moderate; he was bleeding from scratches on his face. *See id.* at ¶ 8 (citing R. at 435, 437, 440). An X-ray study of his mandible was completed and he was diagnosed with contusion of the face. *See id.* (citing R. at 437–48, 442).

On December 12, 2015, Marcos was in another motor vehicle accident and transported to the hospital. *See id.* at ¶ 14. He was in a coma and required intubation for airway protection. *See id.* His left hip was dislocated and attempts to reduce the left hip were unsuccessful. *See id.* A CT scan performed of his chest and thorax further revealed a comminuted two-column left acetabular fracture with posterior displacement of the interior fragment and dislocation of the left femoral head, in addition to associated hepatomas of the left iliacus, gluteus medius muscles without active extravasation, and mild intrahepatic biliary duct dilation. *See id.* at. ¶ 15; R. at 500. A CT scan of the abdomen and pelvis displayed stable fluid in the pelvis (likely consistent with blood products), several intra-articular osseous fragments within the left hip, and a transverse fracture through the left acetabular anterior and posterior columns. *See* Doc. No. 15-2, at ¶ 15 (citing R. at 508).

On December 16, 2015, he underwent another orthopedic surgery, that is, open reduction and internal fixation of his left transverse and posterior wall acetabulum fracture. *See id.* at ¶ 19; R. at 487. A CT scan performed that day evidenced near complete anatomic alignment restored and hardware in good positioning, as well as a trace lingering of free fluid in the pelvis, representing mild improvements since December 12, 2015. *See id.* at ¶ 16 (citing R. at 510).

On December 19, 2015, Marcos was discharged from the hospital to a skilled nursing facility. *See id.* at ¶ 17 (citing R. at 482). Nearly a month later, on January 15, 2016, Marcos was discharged from the nursing facility to his home and prescribed a left knee immobilizer to be worn in bed, as well as a multipodus boot for the left foot when in bed for a foot drop. *See id.* at

5

¶ 18 (citing R. at 517, 522).  At the time, he complained of a pain level of ten out of ten on his left hip.  *See id.* (citing R. at 530).

On January 19, 2016, Marcos had a follow-up appointment for his surgery with Dr. John Obrien, M.D.  *See* Doc. No. 15-2, at ¶ 19; R. at 487–88.  Marcos reported doing fairly well; his pain was in better control, although he continued to take Percocet to alleviate the pain.  *See* Doc. No. 15-2, at ¶ 19 (citing R. at 487); R. at 487.  He suffered from sciatic nerve palsy since the hip dislocation and noted that his sensation is improving, with full sensation in the foot.  *See id.*; R. at 487.  He also had some flicker of motor in the foot.  *See* Doc. No. 15-2, at ¶ 19; R. at 487. Although the sciatic nerve palsy had only minimally improved, Dr. Obrien observed Marcos to be progressing "appropriately."  R. at 487.

Marcos flagged that he noticed increasing swelling in his left foot over the past week. *See* Doc. No. 15-2, at ¶ 19 (citing R. at 487).  Due to a concern that the swelling was consistent with deep vein thrombosis, he was referred for a lower extremity ultrasound, which revealed a clot in the peroneal calf vein.  *See id.*  As a result, he was placed on Lovenox subcutaneous daily for three months.  *See id.* (citing R. at 489).

On January 25, 2016, Marcos had another follow-up appointment and complained of a left foot drop.  *See id.* at ¶ 20 (citing R. at 636, 637).  On February 15, 2016, Marcos presented to the emergency department via ambulance with left leg pain.  *See id.* at ¶ 21; R. at 736.  He claimed that he had been taking Gabapentin and Percocet but that he had ran out of Percocet the week prior, and that the medication did not fully alleviate his pain.  *See* Doc. No. 15-2, at ¶ 21; R. at 736.  He also stated that he is unable to sleep secondary to pain.  *See* Doc. No. 15-2, at ¶ 21; R. at 736.  An x-ray examination showed a subtle fibula fracture, and Marcos was placed in an orthopedic boot and prescribed pain medication.  *See* Doc. No. 15-2, at ¶ 21; R. at 738.

On February 19, 2016, Marcos was admitted to the hospital by ambulance and presented with bilateral pulmonary embolism with pulmonary infarction. *See* Doc. No. 15-2, at ¶ 22 (citing R. at 619). He had difficulty breathing and reported leg and back pain, having run out of OxyContin. *See id.* (citing R. at 606). The medical records noted that he had not been compliant with his medications following his deep vein thrombosis diagnosis in January 2016. *See* Doc. No. 15-2, at ¶ 22; R. at 607. He was further noted to have been "wheelchair bound." *See* Doc. No. 15-2, at ¶ 22; R. at 607.

On February 22, 2016, Marcos presented to the emergency department complaining of left foot pain. *See* Doc. No. 15-2, at ¶ 23; R. at 734. He stated that he had run out of his Gabapentin medication and that his doctor had not returned his call. *See* Doc. No. 15-2, at ¶ 23 (citing R. at 734). He was given a dose of Gabapentin and discharged. *See id.* (citing R. at 735).

On March 1, 2016, Marcos presented for a follow-up appointment with a blood clot in his left lung. *See* Doc. No. 15-2, at ¶ 24. He requested a refill of Gabapentin and Percocet, explaining that those medications provided relief when his pain increased at night. *See id*. (citing R. at 640).

On March 12, 2016, Marcos presented to the emergency department with complaints of pain radiating down his left leg and affecting his ambulation. *See* Doc. No. 15-2, at ¶ 26; R. at 731. He also reported left ankle swelling and pain in his left knee, and stated that he had recently run out of pain medication. *See* Doc. No. 15-2, at ¶ 26; R. at 731. He asked for a refill of Percocet, elaborating that he cannot return to Hartford Hospital, where he was treated, because of transportation issues. *See* Doc. No. 15-2, at ¶ 26 (citing R. at 731–32). He was noted to be agitated and aggressive. *See id*. After a review of his symptoms, he was assessed to have gait problems, with left leg pain and left foot swelling. *See id*. (citing R. at 732). He was also

observed to have muscle wasting, likely from casting. *See id.*; R. at 733. He was advised to continue using crutches and to ice and elevate his ankle when at home. *See* Doc. No. 15-2, at ¶ 26 (citing R. at 733).

On March 26, 2016, Marcos presented with left foot pain, which he indicated "comes and goes" since the December 2015 accident. *Id*. at ¶ 27 (citing R. at 729). He stated that he took Tramadol without relief, and rated his pain level as five out of ten. *See id*. (citing R. at 729). Upon a review of his symptoms, he was assessed to have arthralgias, gait problems, and myalgias. *See id.* (citing R. at 730). The records further reflect that Marcos had not followed up with his orthopedic specialist because he did not have access to transportation; he and the treating provider therefore discussed the importance of following up with an orthopedist and seeking chronic pain management. *See id.*; R. at 731. Marcos was offered Motrin, which he accepted, but he became angry when he was denied narcotics and was assessed to show "some drug seeking potential." *See* Doc. No. 15-2, at ¶ 27; R. at 731. He "wheel[ed] himself out" and refused to sign the discharge forms. *See* Doc. No. 15-2, at ¶ 27 (citing R. at 731).

Two days later, on March 28, 2016, Marcos went to the emergency department with complaints of chronic left leg pain. *See* Doc. No. 15-2, at ¶ 28; R. at 727. Upon his arrival, he was upset, tearful, and requested pain medications. *See* Doc. No. 15-2, at ¶ 28; R. at 727. He was also aggressive, swore at hospital staff, and refused to provide information, necessitating the presence of security guards. *See* Doc. No. 15-2, at ¶ 28; R. at 726. He explained that he visited the orthopedic clinic that day for pain management but that his provider was not available. *See* Doc. No. 15-2, at ¶ 28; R. at 727. He stated that there been no notable changes in his symptoms. *See* Doc. No. 15-2, at ¶ 28 (citing R. at 727). The treating physician counseled him on the importance of establishing ongoing care for his chronic pain condition, but acknowledged the

8

difficulty that Marcos might face in establishing care with a pain specialist in light of his insurance. *See* Doc. No. 15-2, at ¶ 28; R. at 728.

On April 12, 2016, following his visit to the emergency department for chronic left lower extremity pain, Marcos attended a follow-up appointment at a clinic. *See id.* at ¶ 29; R. at 725. Marcos explained that he had been unable to attend orthopedic appointments in Hartford due to the distance. *See* Doc. No. 15-2, at ¶ 29; R. at 725. On physical examination, his muscle strength was scored as a two out of five in plantar flexion and as a zero out of five in all other quadrants. *See* Doc. No. 15-2, at ¶ 29 (citing R. at 725).

On May 2, 2016, Marcos attended physical therapy with weakness of the left lower extremity. *See id.* at ¶ 32 (citing R. at 722). According to the medical records, he walked with a straight cane but was independent in personal care such as bathing, dressing, and grooming, although he experienced difficulty when walking, cleaning, and cooking. *See id.*; R. at 722. Marcos noted that his best recent pain evaluation was eight out of ten and that his worst recent pain evaluation was nine out of ten. R. at 723. The pain is located in the left lower leg and aggravated by weather, and was described as aching, sharp, and stabbing with paranesthesia. *See* Doc. No. 15-2, at ¶ 32; R. at 723. On physical examination, Marcos was observed to have decreased gait cadence and an antalgic gait pattern but "decent mobility." *See* Doc. No. 15-2, at ¶ 32; R. at 724.

On May 13, 2016, Marcos went to physical therapy with left hip pain and was observed to have weakness in the left lower extremity. *See* Doc. No. 15-2, at ¶ 33; R. at 721. He noted that he experienced considerable pain in the back of his left calf, with his pain level rated as a ten out of ten. *See* Doc. No. 15-2, at ¶ 33; R. at 721. He was evaluated to have performed well in all

exercises but with noted hip weakness, although his pain went down to a level of three with stretching.  *See* Doc. No. 15-2, at ¶ 33 (citing R. at 721).

Later that day, Marcos visited the emergency department, reporting left leg pain at a level of ten out of ten.  *See* Doc. No. 15-2, at ¶ 34; R. at 703.  He also indicated that he previously had left leg swelling, which had resolved.  R. at 703.  He stated further that he had difficulty walking secondary to pain, and that he had some chest discomfort approximately one week earlier.  *See* Doc. No. 15-2, at ¶ 34 (citing R. at 703, 705).  An examination revealed pulmonary embolism and an ultrasound displayed deep vein thrombosis.  *See id*. (citing R. at 853); R. at 854.  He was thereafter admitted to the hospital for further evaluation and treatment.  R. at 703.

On May 14, 2016, while Marcos was in the hospital, he was assessed to be ambulatory with a cane.  *See* Doc. No. 15-2, at ¶ 35; R. at 710.  He rated his pain level on his left leg and calf—which were observed to be slightly pink and tender to the touch—as an eight out of ten.  *See* Doc. No. 15-2, at ¶ 35; R. at 710.  He was offered a wheelchair for discharge but declined.  *See* Doc. No. 15-2, at ¶ 35 (citing R. at 714).

On May 21, 2016, Marcos presented to the emergency department with sciatica and nerve pain.  *See* Doc. No. 15-2, at ¶ 36; R. at 701.  He reported that he had ran out of Gabapentin and Tramadol, and requested refills of both medications.  *See* Doc. No. 15-2, at ¶ 36 (citing R. at 701).

On May 27, 2016, at a physical therapy appointment, Marcos presented with foot drop and lower extremity weakness.  *See id*. at ¶ 37; R. at 701.  He was unable to dorsiflex, which upset him, and muscle fatigue was noted during a straight leg raise and other exercises.  *See id*. at ¶ 37 (citing R. at 701).  He communicated that he experienced pain in the back of his leg in the calf area, rating the pain level as a ten out of ten.  *See id.* at ¶ 37 (citing R. at 700).

On June 3, 2016, Marcos had another follow-up appointment at a primary care clinic. *See id*. at ¶ 38; R. at 696.  He reported left lower extremity pain that responded well to Gabapentin, although the relief was not long-lasting.  *See* Doc. No. 15-2, at ¶ 38; R. at 696. According to the medical records, the pain has improved slowly since the accident.  *See* Doc. No. 15-2, at ¶ 38; R. at 696.  Marcos also complained of shortness of breath on exertion since the hospitalization and expressed an interest in quitting smoking, noting that he smokes about ten cigarettes per day.  *See id*. (citing R. at 696).  In addition, he discussed how he still cannot move his foot and that his quadriceps muscles are weak, but that the pain on his calf was presently minimal.  *See id.* (citing R. at 698); R. at 699.  He missed his appointment to get an AFO brace, which had been medically recommended for his foot drop, and represented that he would make a new one.  *See* Doc. No. 15-2, at ¶¶ 38, 39; R. at 699.

On June 21, 2016, at a follow-up visit for his orthopedic surgery, Marcos reported pain and nerve pain down his legs.  *See* Doc. No. 15-2, at ¶ 39; R. at 694.  He also noted that the Gabapentin is helping to alleviate the pain, but that he still experiences muscle spasms.  *See* Doc. No. 15-2, at ¶ 39; R. at 694.  Upon physical evaluation, he was given a score of three out of five for muscle strength in plantar flexion of his foot and zero out of five in dorsiflexion.  *See* Doc. No. 15-2, at ¶ 39; R. at 694.  He was additionally observed to have some tenderness to palpitation over the dorsum of the left foot and ankle, but to feel better in high-top sneakers.  *See* Doc. No. 15-2, at ¶ 39; R. at 694.  His range of motion of the hip was evaluated to have no significant restriction, although mild tenderness was noted.  *See* Doc. No. 15-2, at ¶ 39; R. at 694.

Testing showed some reinnervation of the peroneals.  *See* Doc. No. 15-2, at ¶ 39; R. at 694.  In addition, the records indicate that Marcos had planned to obtain an AFO device later in

the month, that therapy was scheduled to restart in late June, and that Valium was prescribed for his muscle spasms.  *See* Doc. No. 15-2, at ¶ 39; R. at 694.  Nerve recovery was expected to continue for "many more months."  *See* Doc. No. 15-2, at ¶ 39 (citing R. at 694).

On June 24, 2016, Marcos did not attend physical therapy for the third time.  *See id.* at ¶ 40 (citing R. at 693).  He did not attend his prior appointment on June 9, 2016 because of transportation issues.  *See id.* (citing R. at 695).

On July 14, 2016, Marcos presented to the emergency department with foot pain.  *See id.* at ¶ 41; R. at 691.  He reported that, over the past three days, he had endured increasing pain in the left hip area, particularly when walking or sitting.  *See* Doc. No. 15-2, at ¶ 41; R. at 691.  He requested more pain medications.  *See* Doc. No. 15-2, at ¶ 41 (citing R. at 691).

On July 26, 2016, Marcos visited the emergency department with hip pain radiating to his back and leg.  *See* Doc. No. 15-2, at ¶ 42; R. at 689.  He indicated that the pain has been chronic since his accident and that the pain is exacerbated with motion.  *See id.*; R. at 689.  He also noted that he has been out of his pain medication for the past few days.  *See* Doc. No. 15-2, at ¶ 42 (citing R. at 689).  He was observed to have a full range of motion in his left hip.  R. at 691.

On August 1, 2016, Marcos went to the emergency department with left hip pain that had persisted for multiple hours and that he rated as a ten out of ten.  *See* Doc. No. 15-2, at ¶ 43.  He ran out of his Tramadol the day prior and ambulates with pain.  R. at 687.  He denied shortness of breath, chest pain, or edema.  *Id.*

On August 2, 2016, Marcos was seen for an initial evaluation for HIV disease management.  *See* Doc. No. 15-2, at ¶ 44; R. at 684.  He had experienced vivid dreams due to his medication and was therefore interested in changing medication, which was tabled for discussion at a follow-up appointment.  *See* Doc. No. 15-2, at ¶ 44; R. at 687.  His chronic pain following

12

the left hip fracture was also noted, and it was decided that he would continue with his pain medication. *See* Doc. No. 15-2, at ¶ 44 (citing R. at 687).

On August 23, 2016, Marcos had a follow-up evaluation for his left hip and reported hip pain. *See* Doc. No. 15-2, at ¶ 45; R. at 681. According to the medical records, he had not yet received his AFO brace for his foot drop, and transportation issues precluded him from attending physical therapy. *See* Doc. No. 15-2, at ¶ 45 (citing R. at 681).

On September 8, 2016, he presented to the emergency department with complaints of palpitations, heart racing, and shortness of breath while lying down. *See* Doc. No. 15-2, at ¶ 46; R. at 678. He stated that he had been unable to sleep for the past four days. *See* Doc. No. 15-2, at ¶ 46 (citing R. at 678). He exhibited no swelling or tenderness in his left lower extremity. *See id*. (citing R. at 680). The differential diagnoses provided at the time included palpitations, insomnia, anxiety reaction, and panic attacks, among others. *See id.* (citing R. at 680).

On September 20, 2016, at a follow-up visit for HIV management, Marcos expressed a pain level of ten out of ten in his left leg without pain medications, and added that Tramadol brings his pain down to one out of ten. *See id*. at ¶ 47; R. at 674. According to the medical records, the pain affects his ability to walk and to work; he has a cane for walking but "tries not to use it." *See id.*; R. at 674. He attends physical therapy three times a week and had still not yet received his AFO brace. *See* Doc. No. 15-2, at ¶ 47 (citing R. at 674). Neurologically, his left leg was numb and he could not feel his toes. *See id*.; R. at 675. He, moreover, had tingling and felt an electric shock through the left foot and toes. *See* Doc. No. 15-2, at ¶ 47 (citing R. at 675).

On physical examination, Marcos exhibited diminished strength in his left lower extremity and decreased sensation spanning from the left foot to the ankle. *See* Doc. No. 15-2, at ¶ 47; R. at 676. It was also noted that he had a cane to walk but that he did not use it often, and

that he used light weights for exercise and could walk slowly. *See* R. at 677. His Gabapentin

dosage was increased. *See* Doc. No. 15-2, at ¶ 47 (citing R. at 677).

On September 20, 2016, Marcos requested transportation for physical therapy and

medical visits. *See id.* at ¶ 48; R. at 794. His medical records indicate that, at the time, he could

not bend and had a cane to walk, although he did not use it often. *See* Doc. No. 15-2, at ¶ 48; R.

at 794. The records further indicate that, although he needed the bathroom bar to bathe, he could

bathe and dress himself, attended church three times a week, made his own food, and used a

handicapped cart at the store. *See* Doc. No. 15-2, at ¶ 48; R. at 794. He could also climb the

stairs and walk slowly but could not run; he additionally used light weights for his arms. *See*

Doc. No. 15-2, at ¶ 48; R. at 794. He also experienced pain in his hip while sitting. *See* Doc.

No. 15-2, at ¶ 48 (citing R. at 794).

On September 28, 2016, Marcos again requested social work assistance with

transportation to his medical appointments, in addition to reasonable housing accommodations

due to his difficulty walking. *See id.* at ¶ 50; R. at 794. He specifically requested an apartment

on the first floor, explaining that climbing the stairs to his apartment on the third floor was

challenging and painful for him and that he has to walk slowly due to his hip pain, sciatica, and

foot drop. *See id.* at ¶ 50; R. at 794. Marcos added that those activities are difficult even with a

cane. *See* Doc. No. 15-2, at ¶ 50 (citing R. at 794–95).

On November 1, 2016, Marcos had a follow-up visit for HIV management. *See id.* at ¶

51; R. at 795. The records note that he was adhering to his medications, did not experience side

effects at the time, and was sleeping better with no bad dreams. *See* Doc. No. 15-2, at ¶ 51; R. at

795. They further noted that he was experiencing chronic left hip pain. *See* Doc. No. 15-2, at ¶

51 (citing R. at 795).

Upon physical examination, Marcos was assessed to have 10 to 15 degree of plantar flexion and almost no dorsiflexion in the left foot, along with decreased sensation to touch. *See* Doc. No. 15-2, at ¶ 51; R. at 798. Marcos expressed that, although he had orders for physical therapy, he felt that he could do his exercises at home. R. at 796. He also indicated that he could do pushups on the wall, squats, and leg raising, and that he walks for exercise. *See id.* He was ultimately diagnosed with asymptomatic HIV infection and chronic pain syndrome. *See* Doc. No. 15-2, at ¶ 51 (citing R. at 798).

On January 9, 2017, while attending an HIV clinic, Marcos continued to complain of chronic left hip pain. *See id.* at ¶ 52; R. at 799. Nerve damage to the left foot and his left foot drop were observed, as was the fact that his gait was improving somewhat. *See* Doc. No. 15-2, at ¶ 52; R. at 799. He presented with some hypersensitivity on the plantar area of the foot, and was reported to have essentially no strength to elevate his left foot and to have a "mild limp." *See* Doc. No. 15-2, at ¶ 52 (citing R. at 799, 805); R. at 801.

On March 7, 2017, Marcos presented with left leg pain and requested more Tramadol and Gabapentin. *See* Doc. No. 15-2, at ¶ 53; R. at 806. He reported hypersensitivity in the left lower leg, as well as left hip pain and gradual improvements in the left foot. *See* Doc. No. 15-2, at ¶ 53; R. at 806. Even with improvement, however, he still had a left foot drop. *See* Doc. No. 15-2, at ¶ 53; R. at 811.

On May 15, 2017, Marcos went to the emergency department for evaluation of his left ankle after reportedly dragging his toes while running. *See* Doc. No. 15-2, at ¶ 54; R. at 812. He also complained of persisting pain on his left shoulder blade, along with shortness of breath and occasional palpitations. *See* Doc. No. 15-2, at ¶ 54; R. at 812. On physical examination, he

exhibited minimal tenderness of the dorsal aspect of his left foot, as well as decreased strength with dorsal flexion.  *See id;* R. at 813.

On June 23, 2017, Marcos attended a follow-up appointment for HIV management.  *See* Doc. No. 15-2, at ¶ 55; R. at 816.  He reported ongoing hip pain.  *See* Doc. No. 15-2, at ¶ 55 (citing R. at 816).  Marcos asked for a letter for work and probation "so that he does not have to stand more than 7 hours a day."  *See* Doc. No. 15-2, at ¶ 55; R. at 818.  He was prescribed Gabapentin, Tramadol, and Ibuprofen for his pain.  *See* Doc. No. 15-2, at ¶ 55 (citing R. at 818).

1.  *Medical and Non-Medical Opinions*

a.   Letter from Claribel Coreano, M.S.

On July 31, 2015, Claribel Coreano, a master's level social worker and a senior director of clinical services for permanent supportive housing at Alpha Community Services YMCA, where Marcos resides, prepared a letter on Marcos's behalf that discussed Marcos's progress since his move on July 30, 2013 to the supportive housing program.  *See id.* at ¶ 10.  She wrote that, since moving in, Marcos has endeavored to keep himself employed and worked at three different jobs, all of which he was laid off from.  *See id.*  She elaborated that Marcos reportedly experiences muscle and joint pain, tiredness, difficulty concentrating, and sleepiness, in addition to depressive symptoms, all of which he believed had been a barrier to maintaining employment.  *See id.* (citing R. at 450).

Coreano's letter further provided that, at an August 1, 2013 meeting, Marcos represented that his triggers are depression and stress; that he has a past addiction to marijuana but that he has since been sober; that he was physically and verbally abused by his mother since age 5 and sexually abused by a female cousin since age 3 or 4; and that he has a history of suicide attempts at ages 14 and 15.  R. at 453.  During that meeting, Marcos also reported occasional depression,

16

mood swings, inability to sleep, and constant body movement.  *Id*.  He further explained that he often cannot stay still and needs to be active at all times.  *Id*.

      b.   Consultative Examination Report by Dr. Jesus Lago, M.D.

On October 2, 2015, Dr. Jesus Lago, M.D., a consultative psychiatrist, performed a consultative psychiatric evaluation of Marcos, during which he observed, interviewed, and evaluated Marcos in a clinical setting.  S*ee* Doc. No. 16-2, at ¶ 11; R. at 9.  Following his examination, Dr. Lago diagnosed him with depressive disorder.  R. at 479.

As articulated in his report, Dr. Lago observed that Marcos was meticulously groomed, but that he appeared undernourished and tired.  *See* Doc. No. 16-2, at ¶ 11 (citing R. at 477).  Marcos communicated to Dr. Lago that he had been depressed for the past two years, but that his depressive days have not outnumbered his euthymic days.  R. at 477.  Marcos also noted that his sleep is disturbed at times, that his energy has been somewhat low, and that his appetite has been fair.  *Id*.  Marcos further reported that he lost a considerable amount of weight due to diarrhea and gastrointestinal symptoms most likely secondary to HIV.  *See* Doc. No. 16-2, at ¶ 11; R. at 477.  In addition, Marcos discussed how he has been feeling weak and experiencing muscle wasting, and that he had to leave his last job due to his weakness, which had been depressing for him.  *See* Doc. No. 16-2, at ¶ 11; R. at 477–78.  He stated that he cannot work due to his physical conditions and that he does not feel the need for psychiatric care at this time.  *See* Doc. No. 16-2, at ¶ 11; R. at 477–78.

Dr. Lago opined that Marcos was in contact with reality and fully oriented; that he related quite well and established a very good rapport; that he was socially appropriate and engaging; and that his speech was of normal rate, tone, and intensity.  R. at 479.  Dr. Lago also observed that his speech was coherent, logical, and goal-directed, and that he had no hallucinations,

delusions, or thought content disorders. *See id.* Dr. Lago judged his cognition as excellent, and indicated that he was able to follow commands and instructions. *See id.* Dr. Lago further viewed Marcos as insightful, attentive, and well-focused, with intact immediate, short-term, and remote memory. *See id.* Although Marcos could not perform serial 7s, he could perform serial 3s without difficulty and could spell the word "world" correctly in both directions. *See id.* Dr. Lago ultimately determined that Marcos was capable of handling funds in his own best interest and that his prognosis was "very good" psychiatrically. R. at 480.

    c.   Opinion of Dr. Hedy Augenbraun, Ph.D.

On October 14, 2015, Dr. Hedy Augenbraun, Ph.D., a state agency reviewer, rendered an opinion on Marcos's work capacity at the initial level. Dr. Augenbraun opined, in relevant part, that Marcos had "mild" restriction in activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, and pace. *See* Doc. No. 16-2, at ¶ 12 (citing R. at 142, 150). Dr. Augenbraun also reported that there were no repeated episodes of decompensation. R. at 142.

    d.   Opinion of Dr. S. Williams, M.D.

On October 20, 2015, Dr. S. Williams, a state agency reviewer, rendered an opinion on Marcos's work capacity at the initial level. He ultimately opined that Marcos's physical impairments were non-severe. R. at 141; *see* Doc. No. 16-2, at ¶ 13.

    e.   Impairment Questionnaire by Claribel Coreano, M.S.

On March 11, 2016, Coreano completed an impairment questionnaire on behalf of Marcos. *See* Doc. No. 15-2, at ¶ 25. According to the questionnaire, Marcos had been seen for supportive services and case management on a monthly, weekly, or as needed basis since March

15, 2013.  *See id.* at ¶ 25; R. at 653.  Coreano noted that Marcos reported depression during intake and that he continues to experience depression, which is impacting his overall well-being and his ability to concentrate and conduct daily living skills.  *See* Doc. No. 15-2, at ¶ 25; R. at 653–54.  Marcos also conveyed that he feels preoccupied with his health and experiences anxious and angry thoughts.  *See* Doc. No. 15-2, at ¶ 25; R. at 652.  He denied difficulties with judgment and decision-making.  *See* Doc. No. 15-2, at ¶ 25 (citing R. at 654).

Coreano stated that Marcos takes his medication as directed.  *See id.* at ¶ 25; R. at 653. She further stated that the December 2015 car accident resulted in a loss of mobility in his left leg, and that he is "wheelchair bound" and unable to function on his own.  *See* Doc. No. 15-2, at ¶ 25 (citing R. at 653); R. at 654.  According to the questionnaire, Marcos reported that he is unable to socialize with other residents in supportive housing due to his pain and that he is unable to go outside because of inability to walk on his own.  *See* Doc. No. 15-2, at ¶ 25; R. at 656.

Coreano opined that Marcos has a "reduced ability" to take care of personal hygiene; use good judgment regarding safety and dangerous circumstances; use appropriate coping skills; interact appropriately with others; respect or respond appropriately to others in authority; get along with others without distracting them or exhibiting behavioral extremes; carry out single-step instructions; focus long enough to finish simple activities or tasks; and change from one simple task to another.  *See* Doc. No. 15-2, at ¶ 25; R. at 655–66.  She also determined that Marcos has "no ability" to care for his physical needs (e.g., dressing and eating) and a "limited ability" to handle frustration appropriately, carry out multi-step instructions, perform basic activities at a reasonable pace, and persist in simple activities without interruption from psychological symptoms.  *See* Doc. No. 15-2, at ¶ 25; R. at 655–56.

f.   Consultative Examination Report by Dr. Lago Dated April 22, 2016

On April 22, 2016, Dr. Lago performed a second psychiatric consultation examination of Marcos.  *See* Doc. No. 15-2, at ¶ 30; R. at 665.  He again diagnosed Marcos with depressive disorder.  *See* Doc. No. 15-2, at ¶ 30 (citing R. at 666–67).

As discussed in Dr. Lago's report, Marcos arrived to the examination in a wheelchair with his left side elevated.  *See id.*; R. at 665.  Marcos stated that he will not walk again in light of his left femur fracture and left foot drop.  *See* Doc. No. 15-2, at ¶ 30; R. at 665.  He also disclosed that he experienced episodes of depression since his HIV diagnosis.  *See* Doc. No. 15-2, at ¶ 30 (citing R. at 665).

Dr. Lago observed that Marcos's grooming was meticulous and that he was very well spoken.  *See id.*; R. at 665.  He opined that Marcos had excellent cognition, that his affect was appropriate and in full range, and that he followed commands and instructions.  *See id.*; R. at 667.  Although Marcos declined to perform serial sevens, he performed serial threes without difficulty; he was also able to recall three out of three objects immediately and after five minutes, and could spell the word "world" without difficulty.  *See id.*; R. at 667.  Dr. Lago noted that his memory was intact, and that he sustained concentration and persistence throughout the interview. R. at 667.  Dr. Lago determined that, from a psychiatric standpoint, he was capable of adapting to a work schedule and capable of handling funds in his own best interest.  *Id.*

g.   Opinion of Dr. Janine Swanson, Psy.D.

On April 27, 2016, Dr. Janine Swanson, Psy.D., a state agency psychologist, rendered an opinion on Marcos's work capacity at the reconsideration level.  *See* Doc. No. 15-2, at ¶ 31 (citing R. at 163, 177).  He opined that Marcos had "mild" restriction of activities of daily living; "mild" difficulties in maintaining concentration, persistence, or pace; and no difficulties in

maintaining social functioning.  R. at 163, 177.  Dr. Swanson also determined that Marcos had

no repeated episodes of decompensation.  *Id*.

### h.   Opinion of Dr. Rafael Wurzel, M.D.

On September 27, 2016, Dr. Rafael Wurzel, M.D., a state agency reviewer, rendered his

opinion on Marcos's work capacity at the reconsideration level, ultimately concluding that

Marcos was not disabled.  R. at 167.  In particular, he determined that Marcos can occasionally

lift up to 20 pounds; can frequently lift up to 10 pounds; can stand and/or walk for a total of two

hours; and can sit for a total of six hours in an eight-hour day.  *See* Doc. No. 15-2, at ¶ 49; R. at

164–65.  Dr. Wurzel further determined that Marcos can occasionally climb ramps and stairs,

kneel, crouch, and crawl, and that, if he is using a cane, he may carry objects in his free hand.

*See* Doc. No. 15-2, at ¶ 49; R. at 165.  He also opined that can never climb ladders, ropes, or

scaffolds, and can frequently balance and stoop.  *See id*. at ¶ 49; R. at 165.  In addition, Dr.

Wurzel assessed Marcos to have good range of motion of the left hip.  R. at 165.  Lastly, Dr.

Wurzel opined that Marcos had no manipulative, visual, communicative, or environmental

limitations.  *See id.* (citing R. at 164–65, 182).

### B.  Procedural History

On July 13, 2015, Marcos applied for disability insurance benefits and supplemental

security income benefits, asserting that he had been disabled since January 1, 2014.  R. at 4, 137.

The SSA denied his claim on October 22, 2015.  R. at 4.  He sought reconsideration, but the SSA

adhered to its decision.  *Id*.  He thereafter requested a hearing, which was held on December 7,

2017 before an ALJ.  *Id*.  Marcos appeared at the hearing with counsel.  *Id*.

During the hearing, Marcos testified that he gets around with the help of his friends, his

mother, or through public transportation, which he has difficulty taking.  R. at 100.  He also

discussed how his doctor prescribed him a cane about two years ago, and that he did not bring

the cane with him to the hearing because he has been trying to walk on his own for the past seven

months.  R. at 101.  He added that he does not have full balance, trips frequently, cannot

completely move his foot, and gets tired quickly.  R. at 101.

Marcos next described the 2015 car accident.  He testified that, following the 2015

accident, his face was "cracked," his femur was fractured, his sciatica nerve was damaged, and

his foot dropped.  R. at 106.  He was initially confined to bed for six months and thereafter

attended rehabilitation; following rehabilitation, he used a wheelchair for approximately four

months and then upgraded to a cane.  R. at 107–08.  He explained that he used the cane

constantly around the house at first, and that he continues to use the cane when washing dishes or

cooking, among other activities.  *See* R. at 108–09.

He testified that he also uses the cane for walking and for when he is standing for long

stretches of time.  *See* R. at 109.  He elaborated that he needs better support—such as by wearing

high shoes and by putting his hands out—while he stands for an hour to two hours and that he

could stand for, at most, two hours at a time.  *See* R. at 109–10.  According to Marcos, he could

stand for about 45 minutes without supporting himself on his hands and could walk for about 20

minutes at a time; after then, he starts to get agitated, thirsty, and his back and leg begin "giving

out."  R. at 110.  He further testified that he could sit for an hour at most, after which he needs to

relieve his pain by standing for about ten minutes, walking, or squatting.  R. at 111–12.  He

stated further that he is unable to watch a movie for longer than 45 minutes without needing to

move.  R. at 107.

Marcos noted that he lives in a supportive housing program, which is equipped with a

computer room and handicap assistance throughout the apartment.  R. at 107–08.  He explained

that he is currently working at McDonald's for approximately 12 hours a week, with four-hour long shifts, which he remarked is physically challenging for him.  *See* R. at 112–14.  He testified that he only gets paid for three-and-a-half hours because he takes a half-an-hour break due to his physical problems.  *See* R. at 113–15.  He stands the entire time while working and frequently squats to ease the tension and pain.  R. at 115–16.  He represented that his medication does not afford him relief on the job.  R. at 116.  He also clarified that, although he had went on a run on May 17, 2017, he has otherwise not been running at all.  R. at 125.

Marcos further testified that, when he was diagnosed with HIV, he was unable to mentally cope with the diagnosis.  R. at 102.  He imagined people him around saying "he has HIV" and could not hold a steady job as a result.  *Id*.  He also started to lose weight.  *Id*.

The ALJ next heard testimony from Vocational Expert ("VE") Susan Gabet.  The ALJ asked Gabet to consider a hypothetical individual with the following characteristics:  an individual of Marcos's age, education, and work background who is limited to light work; occasional ramps and stairs; no ladders, ropes, or scaffolds; frequent balancing and stooping; and occasional kneeling, crouching, and crawling.  R. at 128.  The ALJ asked whether there are jobs in the national economy that such an individual could perform, and Gabet responded that such individual would be able to perform the job of a laundry folder, garment folder, and mailroom clerk.  *Id*.

For the second hypothetical, the ALJ asked Gabet to assume the same individual as in the first hypothetical, but to also assume that the individual required a sit/stand option and would change positions as needed without needing to walk away from the workplace.  *Id*.  Gabet stated that such an individual could still perform the jobs of a laundry folder, garment folder, and mailroom clerk.  *Id*.

For the third hypothetical, the ALJ asked Gabet to assume the same individual as in second hypothetical, but with the added limitation of needing a cane to ambulate while being able to carry objects in the free hand up to the light level.  *See* R. at 129.  Gabet testified that such an individual could perform any of the jobs identified.  *Id*.

For the fourth hypothetical, the ALJ asked Gabet to consider the same individual as in the first hypothetical, but to also assume that the individual is limited to sedentary work and required a sit/stand option.  *Id*.  Gabet responded that such an individual could perform the jobs of a ticket checker and order clerk, food and beverage.  *Id*.

For the fifth hypothetical, the ALJ asked Gabet to consider the same individual as in the prior hypothetical, but to add the limitation that the individual would require a cane to ambulate but not while standing.  R. at 130.  Gabet opined that those limitations would not impact the aforementioned jobs.  *Id*.

For the sixth hypothetical, the ALJ asked Gabet to consider the same individual as in the prior hypothetical, but to add the limitation that the individual would require a cane to ambulate and while standing.  *Id*.  Gabet responded that such a limitation would eliminate the foregoing jobs.  *See id*.  The ALJ then asked whether adding a requirement that Marcos is limited to simple, routine tasks would likewise impact those jobs, to which Gabet responded in the negative.  *See id*.

Lastly, the ALJ inquired about the extent to which absenteeism or off-task behavior would be acceptable before the jobs would be eliminated.  *See* R. at 130–31.  In response, Gabet indicated that an individual who had more than one absence per month, or who was off task by more than ten percent, would be precluded from the jobs.  *See id*.

Counsel for Marcos then questioned whether the limitation of needing to squat for ten minutes following an hour of sitting or standing would impact the foregoing jobs, to which Gabet responded in the affirmative.  R. at 132.  Gabet explained that the squatting would qualify as "off task" behavior.  *See id.*

Following the hearing, on December 20, 2017, the ALJ issued a decision finding that Marcos was not disabled.  R. at 4.  On January 9, 2018, Marcos requested review of the ALJ's decision by the Appeals Council, raising a challenge under the Appointments Clause regarding the manner in which the ALJ was appointed.  *Id.*  Because Marcos's argument implicated a broad policy or procedural issue possibly affecting the public interest, the Appeals Council granted review.  *See id.*  The Appeals Council rendered a final decision on October 7, 2019, vacating the ALJ's decision and issuing a new decision that likewise concluded that Marcos had not been disabled from January 1, 2014 through the date of the ALJ's decision.  *See* R. at 4–18.

At the first step of the five-prong inquiry, the Appeals Council found that Marcos had not engaged in substantial gainful activity since January 1, 2014 through the ALJ's decision.  R. at 7.

At the second step, the Appeals Council determined that Marcos's left foot drop, as well as the residual effects of his left hip dislocation and fractured femur, constituted severe impairments, but that his HIV, depressive disorder, left knee impairment, and deep vein thrombosis did not.  *See* R. at 7–8.  In determining that his depression was non-severe, the Appeals Council accorded "significant weight" to the opinions of Dr. Lago and the state agency psychological consultants, but declined to credit Coreano's opinion that Marcos had reduced, limited, or no ability to perform various mental work-related functions.  R. at 8–10.  They reasoned that Coreano's opinion was not consistent with the record as a whole and therefore assigned it "little weight."  R. at 10.

In evaluating Marcos's depression, the Appeals Council also considered whether the "paragraph B" criteria were satisfied, which requires that the mental impairment in question result in greater than mild limitations in the following areas of functioning:  (i) understanding, remembering, or applying information; (ii) interacting with others; (iii) concentrating, persisting, or maintaining pace; and (iv) adapting or managing oneself.  R. at 8.  As detailed below, the Appeals Council determined that Marcos only displayed "mild" limitations in each of those areas.  R. at 8–9.

With respect to understanding, remembering, or applying information, the Appeals Council weighed Dr. Lago's findings that Marcos's cognition was "excellent," that he was "fully oriented," that he followed commands and instructions, and that his memory was intact.  R. at 8.

With respect to interacting with others, the Appeals Council noted Dr. Lago's observations that Marcos related quite well, established a very good rapport, and that, although there were some signs of depression, he was nonetheless socially appropriate and engaging.  *Id*. They also highlighted Dr. Lago's findings that his speech was normal, coherent, and logical; that there was no evidence of a thought disorder; and that his affect was appropriate and full in range. *Id*.  The Appeals Council further noted that both state agency psychological consultants opined that Marcos had no more than mild limitations in terms of maintaining social functioning.  *Id*.

With respect to concentrating, persisting, or maintaining pace, the Appeals Council considered, among other things, Dr. Lago's observations that Marcos was able to follow commands and instructions and was able to perform serial 3s, as well as Dr. Lago's findings that Marcos insightful, attentive, and very well-focused.  R. at 8–9.  The Appeals Council additionally emphasized that both state agency psychological consultants opined that Marcos had

no more than mild limitations with respect to maintaining concentration, persistence, or pace.  R. at 9.

Lastly, with respect to adapting and managing oneself, the Appeals Council discussed how Marcos lives alone, cooks, cleans on his own, and is able to shop for clothes and groceries. *See id*.  They further stated that, although Marcos indicated that his energy fluctuates and that his sleep is sometimes disturbed, he also expressed that his depressive days have not outnumbered his euthymic days.  *See id*.  They added that, during the November 2016 examination with Dr. Lago, he denied depression or sadness and affirmed that he has family support.  *See id*. Accordingly, the Appeals Council concluded that the "paragraph B" criteria were not satisfied at step 2.  *See id.*

The Appeals Council further concluded that Marcos's impairments did not satisfy the "paragraph C" criteria, explaining that "the record does not establish that the claimant had only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life."  R. at 9.

At the third step, the Appeals Council determined that Marcos's severe impairments were not per se disabling because they were not severe enough to meet the criteria of one of the impairments listed in 20 C.F.R. part 404, subpart P, Appendix 1.  *See* R. at 11.  Specifically, the Appeals Council concluded that the impairments did not meet the requirements of Listing 1.02, explaining that the evidence of record "contains no documentation of the involvement of a major peripheral weightbearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b."  *Id*.  They further noted that "no treating or examining physician has recorded findings equivalent in severity to the criteria of any listed impairment and

the evidence of record does not reflect medical findings that are the same or equivalent to those of any listed impairment." *Id*.

Before proceeding to the fourth step, the Appeals Council evaluated Marcos's residual functional capacity ("RFC") and determined that he could perform light work as defined in 20 C.F.R. §§ 404.1567 and 416.967, with the following exceptions:  he (1) can occasionally climb ramps and stairs; (2) can never climb ladders, ropes, or scaffolds; (3) can frequently balance and stoop; (4) can occasionally kneel, crouch, and crawl; and (5) requires the ability to alternate between sitting and standing as needed.  R. at 11.  In reaching the same conclusion, the Appeals Council reasoned that the medical record of evidence was not consistent with Marcos's descriptions of his symptoms.  R. at 12.  The Appeals Council elaborated that the record reflects clinical observations and testing indicative of greater functional abilities than alleged by Marcos, as well as improvement with therapy, improved control of pain symptomology on the current medication regime, self-reported activities of daily living that are independent in nature, a lack of pursuit of additional recommended consultation or treatment, and a lack of significant medical intervention.  *Id*.  The Appeals Council therefore opined that, although Marcos's medically determinable impairments could reasonably be expected to cause the symptoms about which he testified, his statements concerning the intensity and persistence of those symptoms were not well supported by the record.  R at 12–13.

The Appeals Council also highlighted that his imaging tests were normal and that he was unaffected in his ability to ambulate following the 2014 accident.  R. at 13.  Moreover, although he fractured his femur, dislocated his left hip, and developed left foot drop following the December 2015 accident, an examination in February 2016 revealed no redness or sign of infection, good range of motion at the knee and hip, and the ability to perform a straight leg

raise. *Id*. An April 2016 assessment further observed that Marcos had "decent mobility," although weakness had impacted his gait and balance. *Id*.

The Appeals Council additionally noted that Marcos was ambulating with a cane in May 2016. *Id*. Moreover, in June 2016, Marcos represented that the Gabapentin had helped to control his nerve pain and that he had seen improvement when using his high-top sneakers; his range of motion of the hip was also observed as normal with only mild tenderness. *Id*. Further, in July 2016, his medical provider described him as ambulatory, and an exam in September 2016 identified no tenderness or swelling in the left lower extremity. *Id*.

The Appeals Council also took into account that, by November 2016, Marcos was routinely walking and was able to perform a variety of exercises, including pushups on the wall, squats, and leg raises. R. at 13–14. They remarked that it is "notable" that, in 2016, he did not consistently attend all of his physical therapy appointments. R. at 13. They next discussed how gradual improvement was noted and that, by May 2017, Marcos told providers he was running. R. at 14. They added that, although "the evidence may not suggest the claimant is capable of frequently running, it is indicative that he has overstated the degree of limitations." *Id*. The Appeals Council also stressed that the record was devoid of medical evidence from the latter half of 2017 showing continued treatment for the residual effects of his lower left extremity impairments, and that Marcos lives alone, is independent in terms of daily living activities, and was able to return to employment. *Id*.

With respect to the opinion evidence, the Appeals Council accorded "little weight" to the opinion of Dr. Williams on the ground that it was "not consistent with the record as a whole." *See* R. at 15. The Appeals Council, by contrast, assigned "significant weight" to Dr. Wurzel's opinion, explaining that "it is generally consistent with the record as a whole." *See* R. at 15–16.

29

At the fourth step, the Appeals Council found that Marcos had no past relevant work. *See* R. at 17.

At the fifth and final step, the Appeals Council determined—based on Marcos's residual functional capacity, age, education, work experience, and the vocational expert's testimony— that the jobs that Marcos could perform, which included laundry folder (light), garment folder (light), mailroom clerk (light), and ticket checker (sedentary), existed in significant numbers in the national economy. R. at 17–18. The Appeals Council therefore concluded that Marcos was not disabled from January 1, 2014 through December 20, 2017. R. at 18.

This action followed.

## III.   Discussion

On appeal, Marcos argues that he is entitled to a reversal of the Appeals Council's decision or, in the alternative, a new hearing. *See generally* Mot., Doc. No. 15-1. Marcos primarily contends that the Appeals Council (1) failed to adequately explain how Marcos's impairments did not meet or equal the criteria set forth in Listing 1.02A, (2) "minimized" his mental impairments, (3) failed to addresses the reasons underlying lapses in his treatment, (4) improperly weighed certain medical and non-medical opinions, and (5) did not capture all of Marcos's impairments in their RFC determination.[2] *See id.* I address each argument in turn.

---

[2] In his brief, Marcos challenges both the ALJ's decision and the Appeals Council's decision. Because the Appeals Council's decision constitutes the final decision of the Commissioner, the ALJ's decision is not relevant to my analysis. *See* 42 U.S.C. § 405(g) (providing for judicial review of the Commissioner's "final decision"); *see also Smith v. Berryhill*, 139 S. Ct. 1765, 1780 (2019) (holding that the Appeals Council's dismissal of a claim on timeliness grounds is a "final decision . . . made after a hearing" for purposes of allowing judicial review under § 405(g)). I therefore do not address Marcos's arguments concerning the ALJ's decision.

A. Listing 1.02A

Marcos first takes issue with the Appeals Council's decision that his hip displacement and femur fracture with resulting foot drop did not meet or medically equal the requirements of Listing 1.02A. *See* Doc. No. 15-1, at 7. He contends that their explanation is inadequate and that he has "all of the signs and symptoms necessary to meet this listing." *See* Doc. No. 16-1, at 9–11.

To establish a "per se disabling" impairment as set forth in Listing 1.02 of 20 C.F.R. Part 404, Subpart P, Appendix 1, a claimant must demonstrate an "inability to ambulate effectively." *See Polynice v. Colvin*, 576 F. App'x 28, 30 (2d Cir. 2014). Regarding Listing 1.02A in particular, a claimant must demonstrate "major dysfunction of a joint(s) due to any cause, characterized by gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankyloses of the affected joint(s), with involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle) resulting in inability to ambulate effectively, as defined in section 1.00B2b." 20 C.F.R. Part 404, Subpart P, App'x 1 § 1.02A (cleaned up).

Section 1.00B2b, in turn, defines the inability to ambulate effectively as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.* § 1.00B2b.

In this case, substantial evidence supports the Appeals Council's conclusion that Marcos's impairments did not satisfy or medially equal Listing 1.02A. Although the medical

records suggest that, for several months following the December 2015 accident, he was using a wheelchair or crutches to ambulate, Marcos testified at the hearing that he later upgraded to a cane to assist him in standing and walking.  Because satisfaction of Listing 1.02A requires the inability to ambulate effectively "without the use of a hand-held assistive device(s) that limits the functioning of *both* upper extremities," 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00.B2b(1) (emphasis added), the use of only a single cane to ambulate supports the Appeals Council's conclusion that Marcos did not meet or equal the listing.  *See Robinson v. Saul*, 2020 WL 652515, at *6 (D. Conn. Feb. 11, 2020) (explaining that the claimant's occasional use of a single cane to assist with walking did undermine the ALJ's conclusion that the claimant did not demonstrate an inability to ambulate effectively); 20 C.F.R. Part 404, Subpart P, App'x 1 § 1.00B2b(2) (including as examples of ineffective ambulation "the inability to walk without the use of a walker, two crutches or two canes").

    The evidence also suggests that Marcos did not regularly use the cane.  At the hearing, Marcos testified that he did not bring the cane with him to the hearing and that he has been trying to walk on his own for the past seven months.  R. at 101.  Treatment notes dated September 2016 also provide that he did not use the cane often.  R. at 794.  That evidence buttresses the Appeals Council's decision.

    Moreover, a physical exam in February 2016 revealed "limited mobility" to the left foot but good range of motion at the knee and hip and the ability to perform a straight leg raise.  R. at 624.  And as the Appeals Council noted, his physical therapist observed in May 2016 that he had "decent mobility" and, in June 2016, he was observed to have only mild tenderness and no significant restriction in terms of range of the hip.  R. at 694, 724.  Further, in July 2016, when Marcos went to the emergency department to obtain additional pain medications, he was

32

observed to have full range of motion in his left hip.  R. at 691.  In addition, at an emergency department visit in September 2016, he exhibited no swelling or tenderness in his left lower extremity and, in January 2017, he was assessed to have only a "mild limp."  R. at 680, 801.

His activities of daily living further support the Appeals Council's conclusion.  In September 2016, he reported that he can bathe, dress, and feed himself; that he attends church three times per week via bus; that he cleans up at home; and that he can take the stairs slowly.  R. at 794.  In November 2016, as the Appeals Council discussed, he reported that he does various exercises at home and walks for exercise as well.  R. at 796.  Moreover, as he testified, he can wash dishes and cooks with the help of his cane, and he uses public transportation.  R. at 100, 108–09; *cf.* 20 C.F.R. Part 404, Subpart P, App'x 1 § 1.00B2b(2) (listing as an example of ineffective ambulation "the inability to use standard public transportation").

The foregoing evidence, coupled with Dr. Wurzel's opinion that Marcos's impairment did not preclude him from working, is more than sufficient to constitute substantial evidence supporting the Appeals Council's conclusion that he was not per se disabled under Listing 1.02A.  *See Polynice*, 576 F. App'x at 30 (concluding that substantial evidence supported the ALJ's conclusion that the claimant, despite her knee impairment, did not suffer from a "per se disabling" impairment when "[t]he consultative examiner's findings failed to indicate gait abnormalities, and [the claimant] maintained a lifestyle that included performance of household chores and attendance at church and college").

Although the portion of the Appeals Council's opinion addressing Listing 1.02A did not discuss the foregoing evidence, that does not merit reversal.  As the Second Circuit has observed, "[a]lthough we have cautioned that an ALJ should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment, the absence of an express rationale for an

ALJ's conclusions does not prevent us from upholding them so long as we are able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence." *Salmini v. Comm'r of Soc. Sec.*, 371 F.App'x 109, 112–13 (2d Cir. 2010) (cleaned up); *accord Otts v. Comm'r of Soc. Sec.*, 249 F. App'x 887, 889 (2d Cir. 2007) (identifying no error even when "the ALJ might have been more specific in detailing the reasons for concluding that Otts's condition did not satisfy a listed impairment," because "the referenced medical evidence, together with the lack of compelling contradictory evidence from the plaintiff" permitted the Court to affirm that portion of the challenged judgment).

For the foregoing reasons, Marcos's challenge to the Appeals Council's decision that he did not satisfy or equal the criteria of Listing 1.02A is unavailing.

B. Listing 12.00

Marcos also appears to challenge the Appeals Council's conclusion that his depression was non-severe. *See* Doc. No. 15-1, at 13–14. With little elaboration, he asserts that the Appeals Council "minimized" his mental impairments. *See id.* at 13.

After reviewing the entire record and considering the Appeals Council's detailed decision, I conclude that the Appeals Council's determination that his depression was non-severe is supported by substantial evidence. In reaching that conclusion, the Appeals Council considered whether the "paragraph B" criteria for a mental disorder under Listing 12.00 were satisfied. As noted, in order to meet the paragraph B criteria, a claimant must have at least one

extreme[3] or two marked[4] limitations in the following areas of mental functioning:  (i) understanding, remembering, or applying information; (ii) interacting with others; (iii) concentrating, persisting, or maintaining pace; and (iv) adapting or managing oneself.  20 C.F.R. § Pt. 404, Subpt. P, App. 1.

In their decision, the Appeals Council walked through each of the four areas of mental functioning, citing an array of evidence in support of their decision that Marcos had only mild limitations in each area.  R. at 8–9.  More specifically, they relied on Dr. Lago's examination reports dated October 2015 and April 2016, wherein Dr. Lago concluded that Marcos had excellent cognition, was fully oriented, attentive, had an intact memory, and followed commands and instructions.  R. at 8.  They also weighed Dr. Lago's conclusion Marcos was socially appropriate and engaging, related quite well, and established a very good rapport.  R. at 9. Moreover, they emphasized that Marcos told Dr. Lago that he lived alone, cooked, cleaned, performed household chores, and is able to shop for groceries and clothing.  *See id.*

In addition to Dr. Lago's examination results and Marcos's daily activities, the Appeals Council highlighted the findings of both state agency psychological consultants, Drs. Augenbraun and Swanson, that he did not have severe limitations with respect to maintaining social functioning or to maintaining concentration, persistence, and pace.  R. at 9.  In view of the foregoing, there is substantial evidence—indeed, much more than a mere scintilla—supporting the determination that Marcos's mental impairments were non-severe.

Marcos also seems to assert that, contrary to the Appeals Council's conclusion, his "aggressive and threatening" behavior when seeking pain medication at the emergency room,

---

[3] An "extreme" limitation means the claimant is unable to function independently, appropriately, or effectively, and on a sustained basis, in that area.  *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1.
[4] A "marked" limitation means functioning independently, appropriately, effectively, and on a sustained basis in that area is seriously limited.  20 C.F.R. § Pt. 404, Subpt. P, App. 1.

coupled with the fact that he lives in supportive housing, establishes that he cannot function

independently and thus satisfies the "paragraph C" criteria of Listing 12.00.  *See* Doc. No. 15-1,

at 14.  That argument is without merit.

       To satisfy the "paragraph C" criteria, a claimant must establish a medically documented

disorder of at least two years' duration as well as evidence of the following:  (1) medical

treatment, mental health therapy, psychosocial support, or a highly structured setting that is

"ongoing" and that "diminishes the symptoms and signs of [a claimant's] mental disorder" and

(2) "[m]arginal adjustment," that is, the claimant has "minimal capacity to adapt to changes in

[his or her] environment or to demands that are not already part of [his or her] daily life."  20

C.F.R. § Pt. 404, Subpt. P, App. 1.  The regulations further instruct:

> We will consider that you have achieved only marginal adjustment when
> the evidence shows that changes or increased demands have led to
> exacerbation of your symptoms and signs and to deterioration in your
> functioning; for example, you have become unable to function outside of
> your home or a more restrictive setting, without substantial psychosocial
> supports (see 12.00D). Such deterioration may have necessitated a
> significant change in medication or other treatment. Similarly, because of
> the nature of your mental disorder, evidence may document episodes of
> deterioration that have required you to be hospitalized or absent from
> work, making it difficult for you to sustain work activity over time.

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

       Here, the Appeals Council concluded that the evidence failed to establish the presence of

"paragraph C" criteria, explaining that the record does not demonstrate that Marcos had only

marginal adjustment.  R. at 8.  That conclusion is amply supported.  There is a dearth of evidence

suggesting that Marcos is unable to function outside of his home or in a more restrictive setting

without substantial psychological support, or that he had any episodes of deterioration.  Notably,

there is no evidence that he could not maintain his part-time job at McDonald's without

substantial psychological support.  *See Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d

Cir.1983) ("The Secretary is entitled to rely not only on what the record says, but also on what it does not say.").  Dr. Swanson's and Dr. Lago's opinions regarding Marcos's mental health as detailed above further undermine Marcos's argument.

In light of the foregoing, the Appeals Council's determination that Marcos's mental impairments were not serious enough to satisfy the "Paragraph C" criteria is sufficiently supported by the record.  Marcos's residence in a supportive housing program and his outbursts when requesting pain medication in the hospital do not compel a conclusion to the contrary.  *See Bonet ex rel. T.B. v. Colvin,* 523 F. App'x 58, 59 (2d Cir. 2013) ("[W]hether there is substantial evidence supporting the [plaintiff's] view is not the question here; rather, we must decide whether substantial evidence supports *the ALJ's decision*.") (emphasis in original).

## C.  Evaluation of Symptoms

Marcos next argues that the Appeals Council improperly considered his lapses in treatment in determining that his symptoms were less severe than alleged and in ultimately formulating his residual functional capacity.  *See* Doc. No. 15-1, at 12–13.  He contends that the Appeals Council should have considered the reasons underlying such lapses, such as his insurance and transportation difficulties.  *Id*. at 13.

Social Security regulations outline a two-step process for evaluating a claimant's assertions of symptoms such as pain.  *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). First, the ALJ must assess whether there is "a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms." *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013).  If the ALJ determines that the first step is satisfied, he or she must then evaluate the "intensity and persistence" of the claimant's symptoms in order to determine "the extent to which the claimant's symptoms limit the claimant's" capacity for work.  *Id*.  In

undertaking that assessment, the ALJ must consider all of the available evidence, including

objective medical evidence.  *See id*. (citing 20 C.F.R. § 416.929(c)(1)).  The ALJ, however, may

not reject a claimant's subjective opinion regarding the intensity and persistence of the pain

"solely because the available objective medical evidence does not substantiate [the claimant's]

statements."  20 C.F.R. § 416.929(c)(2).  Social Security Ruling 16-3P additionally provides:

> [I]f the frequency or extent of the treatment sought by an individual is not
> comparable with the degree of the individual's subjective complaints, or if
> the individual fails to follow prescribed treatment that might improve
> symptoms, we may find the alleged intensity and persistence of an
> individual's symptoms are inconsistent with the overall evidence of record.
> We will not find an individual's symptoms inconsistent with the evidence
> in the record on this basis without considering possible reasons he or she
> may not comply with treatment or seek treatment consistent with the
> degree of his or her complaints.

*Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disabili*ty *Claims*, SSR 16-3P

(S.S.A. Oct. 25, 2017).

As the Second Circuit has announced, "[i]t is the role of the Commissioner, not the

reviewing court, to resolve evidentiary conflicts and to appraise the credibility of witnesses,

including with respect to the severity of a claimant's symptoms."  *Cichocki*, 534 F. App'x at 75

(cleaned up).  Accordingly, where "the ALJ's decision to discredit a claimant's subjective

complaints is supported by substantial evidence, we must defer to his findings."  *Calabrese v.

Astrue*, 358 F. App'x 274, 277 (2d Cir. 2009).

In the present case, the Appeals Council acknowledged that the impairments "could

reasonably be expected to produce the alleged symptoms," but declined to fully credit Marcos's

descriptions regarding the degree of those symptoms and resulting limitations.  R. at 12–13.  In

doing so, the Appeals Council weighed "clinical observations and testing suggesting greater

functional abilities than alleged by claimant, improvement with therapy, improved control of

pain symptomology on the current medication regime, self-reported activities of daily living that

are independent in nature, a lack of pursuit of additional recommended consultation or treatment, and a lack of significant medical intervention."  R. at 12.  The Appeals Council later stated that it is "notable" that, throughout 2016, Marcos did not consistently attend all of his physical therapy appointments.  R. at 14.

Although the Appeals Council did not explicitly posit why Marcos failed to consistently pursue treatment, Marcos points to no authority suggesting that such an oversight amounts to a reversible error where, as here, his symptoms were discredited on a number of other valid grounds.  Indeed, one of the cases on which he relies—*Henry v. Commissioner*—provided that, "[w]hen the ALJ *primarily if not exclusively* relies on a claimant's failure to seek treatment, but does not consider any good cause explanation for this failure, this court will remand for further consideration."  *Henry v. Commissioner of Social Sec.*, 802 F.3d 1264, 1267–68 (11th Cir. 2015) (emphasis added).  The court continued:  "[h]owever, if the ALJ's determination is also based on other factors, such as RFC, age, educational background, work experience, or ability to work despite the alleged disability, then no reversible error exists."  *Id.* at 1268.

Here, the Appeals Council's decision to discredit Marcos's symptoms was not primarily, and certainly not exclusively, based on any lapses in treatment.  Instead, the Appeals Council cited substantial evidence in support of its determination, including, as discussed above, clinical observations and testing indicative of greater functional abilities in addition to Marcos's daily activities.  Accordingly, when considering the record in its entirety, Marcos's argument that the Appeals Council erred in discounting his symptoms is without merit.

D. <u>Opinion Evidence</u>

Marcos next argues that the Appeals Council improperly weighed the opinions of

Coreano, Dr. Lago, Dr. Wurzel, and Dr. Swanson.  *See* Doc. No. 15-1, at 14.  I address each

opinion below.

1. *Claribel Coreano's Opinion*

Marcos first asserts that the Appeals Council failed to consider Coreano's opinion.  That

argument is belied by the record; the Appeals Council addressed the opinion in its decision and

ultimately assigned it "little weight."  *See* R. at 10.

Moreover, the Appeals Council properly assigned limited weight to Coreano's opinion

and adequately explained the reasons underlying that weight assignment.  As the Appeals

Council indicated, because Coreano is a social worker, she does not qualify as an "acceptable

medical source" under then-applicable 20 C.F.R. § 416.927.[5]  *See Yucekus v. Comm'r of Soc.*

*Sec.,* 829 F. App'x 553, 557 (2d Cir. 2020).  Her opinion, therefore, is "not entitled to controlling

weight or the same degree of deference as a treating physician."  *See* 20 C.F.R. §

416.927(c)(2) (according greater deference to the opinion of a treating source, which is partly

defined as an "acceptable medical source" who has had an ongoing relationship with the

claimant).

Regardless of its source, an adjudicator must assign weight to a non-controlling medical

opinion based on the following factors:  "(1) the frequency, length, nature, and extent of

treatment; (2) the evidence in support of the opinion; (3) the consistency of the opinion with the

---

[5] Because Marcos filed his claim for benefits on July 13, 2015, before the SSA's updated regulations took effect on March 27, 2017, the treating physician rule applies.  *See* 20 C.F.R. § 416.913.  Under the treating physician rule, a treating source's medical opinion will be assigned "controlling weight" if it is "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 416.927(c)(2).

record; (4) the specialty of the physician; and (5) any other factors which may support or contradict the opinion." *Yucekus*, 829 F. App'x at 557 (citing 20 C.F.R. § 416.927(c)).  Section 416.927 further advises that an adjudicator "generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."  20 C.F.R. § 404.1527(f).

Contrary to Marcos's suggestion, the Appeals Council assigned Coreano's opinion limited weight for reasons other than the fact that she is a social worker.  On the contrary, it is evident that the Appeals Council adequately considered each of the applicable factors set forth in section 416.927.  Further, although Marcos had seen Coreano on a regular basis for roughly three years by the time Coreano completed the impairment questionnaire, the Appeals Council articulated sound reasons for discrediting Coreano's opinion that Marcos had a reduced, limited, or no ability to perform various mental work-related functions.  In particular, the Appeals Council explained that her opinion "appears to rely heavily on the claimant's own subjective allegations without corroborating objective evidence."  R. at 10; *see also Gates v. Astrue*, 338 F. App'x 46, 49 (2d Cir. 2009) ("As the ALJ observed, Dr. Rodic's assessment was based on an unreliable foundation: Gates's subjective complaints about his mental limitations.").

The Appeals Council also explained that Coreano's opinion "conflicts with the record which shows that claimant is able to function on his own and work as a fast food server."  R. at 10; *see also Yucekus*, 829 F. App'x at 557 (explaining that the ALJ properly assigned limited weight to a physician assistant's opinion "after noting the lack of other corroborating medical

records and inconsistencies between that statement and Yucekus's testimony regarding his physical capacity").

In sum, the Appeals Council properly exercised its discretion when it resolved the conflicting evidence regarding Coreano and declined to credit her opinion. *Burgess*, 537 F.3d at 128 ("[G]enuine conflicts in the medical evidence are for the Commissioner to resolve.") (cleaned up); *Veino v. Barnhart*, 312 F.3d 578, 588–89 (2d Cir. 2002) (upholding an ALJ's decision to discredit some of the findings of a claimant's treating physician, reasoning that "it was within the province of the ALJ to resolve [conflicting record] evidence in the way she did").

### 2. *Dr. Lago's Opinion*

Marcos next argues that it was error for the Appeals Council to not consider Dr. Lago's opinion. *See* Doc. No. 15-1, at 16. Because the Appeals Council evidently did consider his opinion in their decision, the argument is unpersuasive.

To the extent Marcos argues that the Appeals Council erred by assigning the opinion "great weight," that argument, too, is without merit. As a preliminary matter, although an adjudicator is not "permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion," the adjudicator may "choose between properly submitted medical opinions, including the report of a consultative physician." *Heaman v. Berryhill*, 765 F. App'x 498, 500 (2d Cir. 2019) (cleaned up).

Marcos specifically argues that Dr. Lago failed to perform any kind of "objective testing" and, as a result, Dr. Lago's conclusions are premised on Marcos's unreliable "self-reports." *See* Doc. No. 15-1, at 16. I am not convinced. As the Appeals Council noted, Dr. Lago is a psychiatrist and observed, interviewed, and evaluated Marcos in a clinical setting. R. at 9. Moreover, Dr. Lago's notes demonstrate that he performed a mental health examination at each

42

consultative examination, which, among other things, tested Marcos's abstract thinking skills and his ability to recall serial 3s.  R. at 479, 666–67.  Marcos's assertions that Dr. Lago's assessments of Marcos rest solely on Marcos's "self-reports," rather than objective tests or observations, is therefore baseless.

Marcos also propounds an argument that Dr. Lago's opinion is internally inconsistent, asserting that Dr. Lago's conclusion that Marcos could adapt to a work setting is at odds with his finding that Marcos felt depressed 75% of the time.  *See* Doc. No. 15-1, at 16.  Marcos, however, cites to no authority in support of the proposition that an individual who is often depressed cannot adapt to a work setting or otherwise perform work-related mental functions.  On the contrary, the evidence of record, including Dr. Lago's assessments, clearly demonstrates that Marcos could adapt to a work setting notwithstanding his depression.

For the foregoing reasons, Marcos has failed to adequately challenge the Appeals Council's consideration of Dr. Lago's opinion.  Marcos's argument that it was improper for state agency reviewers to rely on Dr. Lago's opinion is thus without merit as well.  *See* Doc. No. 15-1, at 17.

### 3.  *Dr. Wurzel's and Dr. Swanson's Opinions*

Marcos also appears to contend that it was improper for the Appeals Council to assign "significant weight" to the state agency medical consultants who rendered an opinion on reconsideration:  Dr. Swanson and Dr. Wurzel.  *See* Doc. No. 15-1, at 16.  In so urging, Marcos maintains that the opinions are instead entitled to "little or no weight," because the reviewers did not have the "complete record" at hand when they issued their opinions.  *See* Doc. No. 15-1, at 17.  He elaborates that, at the time the last state agency opinion was issued on reconsideration, records from Hartford Hospital and other medical providers had been requested but not yet

received, and that additional records were received prior to the hearing, which the state agency doctors did not see.  *See* Doc. No. 15-1, at 17.

Critically, however, Marcos proffers no persuasive explanation why any subsequent records were material and would have impacted Dr. Wurzel's or Dr. Swanson's opinions, nor can I glean any reason from the record.  Marcos merely points to a record dated September 20, 2016 that notes that Marcos was unable to bend or sit without hip pain, has a cane to walk but does not use it often, and walks slowly.  *See* Doc. No. 15-1, at 17.  That evidence, however, does not suggest further deterioration of Marcos's condition; if anything, it reflects an improvement from Marcos's wheelchair-bound days.

For those reasons, the case is analogous to *Camille v. Colvin,* where the Second Circuit rejected a claimant's argument that a medical opinion was not supported by substantial evidence because it was "stale" and because additional treatment records were later submitted.  *See* 652 F. App'x 25, 28 n.4.  In so concluding, the Court reasoned that the claimant cited no authority in support of the proposition that "a medical opinion is superseded by additional material in the record."  *Id*.  The Court further explained that the additional evidence "did not raise doubts" regarding the reliability of the medical opinion, as is the case here.  *Id*.  Marcos's argument is therefore unavailing.

Marcos also takes issue with the fact that Dr. Wurzel rendered an opinion on his physical residual functional capacity on September 27, 2016, two months before the one-year anniversary of the December 2015 car accident.  *See* Doc. No. 15-1, at 17.  He avers that a RFC assessment "at 12-months post-onset is necessary for a complete disability evaluation."  *See id*.  Marcos, however, cites to no authority for the proposition that an adjudicator may not consider a medical opinion issued less than 12 months after the alleged onset date.  Disability is defined as the

"inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or *can be expected to last* for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.1505, 416.905(a) (emphasis added).  Dr. Wurzel's assessment clearly informed the question whether Marcos's impairments met that definition; his report stated that Marcos's pulmonary condition is "not expected to remain severe for 12 months" and that the "residual of the left hip [fracture] and sciatic nerve injury [is] expected to last more than 12 months."  R. at 166.  And again, Marcos fails to explain how Dr. Wurzel's opinion would have changed if it were issued in December 2016.

For the foregoing reasons, Marcos has failed to sufficiently challenge the weight that the Appeals Council assigned to the opinions of record.

E. <u>RFC Assessment</u>

Lastly, Marcos argues that the Appeals Council's RFC determination failed to account for all of his impairments.  *See* Doc. No. 15-1, at 19–21.  He specifically asserts that the Appeals Council should have limited him to, among other things, sedentary exertion and cane use.  *See* Doc. No. 15-1, at 21.  He also contends that the Appeals Council should have incorporated into the RFC his need to take frequent breaks to walk around after periods of sitting.  *See* Doc. No. 15-1, at 21.

I am not convinced.  In determining Marcos's RFC, the Appeals Council carefully considered his testimony, physical and mental examinations, and treatment history, and recognized his use of a cane to assist with standing and walking and his need to change positions to alleviate pain after sitting for an hour.  R. at 12.  Substantial evidence supported the Appeals Council's finding that Marcos nevertheless had the RFC to perform light work with the ability to alternate between sitting and standing as needed.  *See Polynice v. Colvin,* 576 F. App'x 28, 30–31

45

(2d Cir. 2014) (concluding that, although claimant was unable to continuously walk, stand, or sit, the ALJ's finding that the claimant had the RFC to perform "some unskilled sedentary work" was nevertheless supported by substantial); *Meyer v. Comm'r of Soc. Sec.*, 794 F. App'x 23, 25 (2d Cir. 2019) ("To the extent the ALJ did not include all of [the examiners'] limitations in the RFC finding, the ALJ was permitted to do so.").

As noted, the treatment records indicate that Marcos had "decent mobility," full range of motion in the hip, and a mild limp, and that he did not use the cane often.  Moreover, he testified that he did not bring his cane to the hearing.  Dr. Wurzel's medical opinion, too, generally supports the RFC.  To be sure, Dr. Wurzel concluded that Marcos could only stand and walk for two hours in an eight-hour workday, and the Appeals Council did not limit the RFC to a maximum of two hours walking or standing.  The Appeals Council nonetheless addressed the discrepancy between Dr. Wurzel's opinion and the RFC by explaining that "the inclusion of the ability to alternate between sitting and standing as needed generally accounts for the discrepancy and is more reflective of the claimant's need to control the length of such periods while remaining on task."  R. at 16.  That conflict was within the province of the Commissioner, not this court, to resolve.  *Burgess*, 537 F.3d at 128 ("[G]enuine conflicts in the medical evidence are for the Commissioner to resolve.").

For the above reasons, the foregoing evidence, along with Marcos's activities of daily living as described above, is sufficient to support the Appeals Council's RFC determination. *Heaman v. Berryhill*, 765 F. App'x 498, 501 (2d Cir. 2019) (concluding that substantial evidence supported the ALJ's RFC determination when the ALJ relied on the opinion of a consultative examiner, medical examiner, and treatment notes).

**IV.**     **Conclusion**

For the reasons set forth, I **grant** the Commissioner's motion to affirm and **deny**

Marcos's motion to reverse.  The Clerk is directed to enter judgment in favor of the

Commissioner and close the case.

So ordered.

Dated at Bridgeport, Connecticut, this 26th day of March 2021.

<u>/s/ STEFAN R. UNDERHILL</u>
Stefan R. Underhill
United States District Judge

47